UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ABDEL NOFAL,

                              Plaintiff,

        - against -

JUMEIRAH ESSEX HOUSE, et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 3, 2010

09 Civ. 2994 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

      Defendants Jumeirah Essex House ("Hotel"), George Dertouzos, and Sarah Gallucci[1] move for summary judgment, pursuant to Fed. R. Civ. P. 56, dismissing Plaintiff Abdel Nofal's claims of employment discrimination in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, the New York State Human Rights Law ("NYHRL"),[2] and the New York City Administrative Code ("NYCAC").[3] Specifically, Nofal alleges that Defendants discriminated against him on the basis of race, national origin, and religion by, inter alia, (1) refusing to accommodate his religious practices; (2) creating a work environment hostile to his race and religion; and (3) terminating him in retaliation for his complaints of discrimination and statements made in an unrelated investigation. Defendants' motion as to the § 1981 claims is

---

[1] Dertouzos is the Hotel's Director of Human Resources, and Gallucci is the Assistant Director of Human Resources. Christian Gradnitzer, the Executive Chef and Nofal's supervisor, is also a named defendant but has not been served with notice of the complaint, presumably because he currently resides in Dubai. He is not a party to this motion.
[2] NYHRL's Executive Law § 296(1)(a) imposes liability where "an employer . . . because of an individual's . . . race, creed . . . [or] national origin . . . refuse[s] to hire or employ or . . . bar[s] or . . . discharge[s] from employment such individual or . . . discriminate[s] against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).
[3] NYCAC's § 8-107(1)(a) imposes liability where "an employer or an employee or agent thereof, because of the actual or perceived . . . race, creed . . . [or] national origin . . . of any person, . . . refuse[s] to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a).

GRANTED.  Since the single federal claim is dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state and city claims.  Accordingly, this case is DISMISSED.

**I.  Facts**

    **A.  Alleged Discrimination**

Nofal, an Egyptian national, who is a Muslim, was an employee of the Essex House from October 12, 1998 until his termination on December 5, 2006.  (Def. 56.1 ¶¶ 5, 43.)  In January 2006, the Dubai-based organization Jumeirah acquired the Essex House.  (Id. ¶ 3.)  Although the principals and several employees of the Hotel were Muslim, Executive Chef Christian Gradnitzer (Nofal's supervisor) and other managers were not Muslim.  (Id. ¶ 4; Compl. ¶ 10.)  Nofal asserts that when Gradnitzer saw Nofal, he often repeated "Salaam Aleikum," which means "peace be with you" in Arabic and is a greeting commonly used by Muslims.  The greeting had a barb to it, as Gradnitzer would mockingly touch his forehead while chewing on bacon.  (Mem. in Opp. 16.)  Gradnitzer allegedly also discussed his Lebanese-Christian wife's eating of pork and sexual activities.  (Nofal Dep. 119, 137-38.)  Nofal contends that he did not complain about these comments for fear of retaliation.  (Pl. 56.1 ¶ 28.)

The Hotel makes some accommodations for their Muslim employees.  The Hotel provided a room for religious observance, which Muslim employees have used for prayer.  The Hotel permitted employees to break fast for Ramadan during their shifts.  (Def. 56.1 ¶ 11.)  Nofal regularly had Fridays (the Muslim Sabbath) and Saturdays off.  (Id. ¶ 12.)  On October 6, 2006, he asked to take off on Sunday, October 22 and Monday, October 23 to celebrate Eid-ul-Fitr ("Eid"), the end of Ramadan.  (Pl. 56.1 ¶ 13.)  It is undisputed that Gradnitzer responded by saying that he "did not care about Ramadan.  It's busy and I need you."  (Def. 56.1 ¶ 17.)  Defendants

contend that, pursuant to Hotel policy, time off is accorded by written request in the order in which it is received. By the time Nofal made his request, four other departmental employees had either previously requested those days off or were on family medical leave. (Dertouzos Aff. ¶¶ 11, 17, 19.) Nofal complained to Human Resources and met with Dertouzos, Gradnitzer, and Union delegates to discuss the denial of his request. (Id. ¶ 19.) He ended up working on Sunday, October 22, but he was given off on Monday, October 23. (Nofal Dep. 91; Def. 56.1 ¶ 19.) Defendants maintain that Eid began on October 23, but Nofal argues that the date of Eid depends on the lunar calendar and varies among communities. (Def. 56.1 ¶¶ 19, 23; Nofal Dep. 81-82.) In the wash, Nofal had seven days off during Ramadan at his request. (Def. 56.1 ¶ 24.)

### B. Termination

On November 16, 2006, Julius Jones, a hotel cook, complained to Human Resources that Nofal harassed a newly hired cook, Robert Felton. (Id. ¶ 35.) Felton allegedly told Jones that Nofal exposed his erect penis to him on two occasions, repeatedly made sexually suggestive comments to Felton, and solicited sex. (Id. ¶ 35.) Jones also reported to Human Resources that Nofal told him that he wanted to "f- Bobby" (i.e., Felton) and bragged about giving candy to underage Mexican boys in exchange for sex.[4] (Id. ¶ 36.) Human Resources commenced an investigation, interviewing Felton, Jones, and Nofal, among others, and learned that Nofal also had allegedly harassed an unnamed female employee by soliciting sex for money. (Id. ¶¶ 37, 39.)

At a December 5, 2006 meeting, the Hotel discussed Jones' charges with Nofal in the presence of his Union delegates. (Id. ¶ 40.) Nofal was advised by his Union delegate to remain silent. (Id. ¶ 41.) During the meeting, Jones allegedly revealed that there would be a large "bonus" for all employees willing to speak against Nofal, in the event Nofal was successfully terminated.

---

[4] Nofal has a wife and children, and claims never to have been in Mexico. (See Nofal Dep. 73, 155.)

(Compl. ¶ 22.) At the conclusion of the meeting, Dertouzos issued the Hotel's decision to terminate Nofal for violating the Hotel's anti-harassment policy.[5] (Def. 56.1 ¶ 43.) Andrelle Aubourg, one of Nofal's co-workers, subsequently submitted a statement to Human Resources alleging that Nofal had repeatedly harassed her. (Id. ¶ 45.)

### C. Arbitration

Article 25 of the collective bargaining agreement that governs Nofal's employment at the Hotel prohibits discrimination on the basis of race, national origin, and religion. (Id. ¶ 6.) Articles 26 and 27 provide for final and binding arbitration of all disputes arising under the agreement. (Id. ¶ 6.) Pursuant to the collective bargaining agreement, Nofal grieved and the Union processed his grievance. (Id. ¶ 46.) At the final stage, Impartial Chairperson ("IC") Philip Ross, a former New York State Labor Commissioner, concluded a three-day arbitration hearing in which Plaintiff was represented by Union Counsel Joseph Farelli, Esq. (Id. ¶¶ 47, 48.) Plaintiff testified in his defense and denied that he had harassed Felton. (Id. ¶ 60.) He also contended that the Hotel was retaliating against him for his statements and complaints in an unrelated investigation of an employee for sexually inappropriate remarks and gestures. (Mem. in Supp. 8 n.6.) One of the witnesses, Andrelle Aubourg, was allowed to testify over the Union's objection. The Union argued that her testimony was irrelevant because the decision to terminate had already been made before she made her statement. While the IC allowed her testimony, he said he would not rely on it when making his decision. (Def. 56.1 ¶¶ 51, 52.) The IC denied the grievance on May 29, 2007. His written decision said that "[t]he basic issue in this case is the credibility of Felton and the Grievant. Whatever way the evidence is turned there is nothing that can impeach Felton's testimony." (Dertouzos Aff. Ex. P, at D-0179.)

---

[5] The Defendants also assert that Nofal had an extensive disciplinary record. (Mem. in Supp. 5.)

Subsequently, the Union requested reconsideration of the decision, submitting a letter and affidavit from Aubourg in which she stated that she testified under pressure from her coworkers and wished to change her testimony. (Def. 56.1 ¶ 62.) Aubourg's affidavit also stated that Hotel managers "all pushed [Felton] into making more false statements." (Rose Aff. Ex. 4 ¶ 10.) Following a hearing, the IC denied the application for reconsideration based on arbitral precedent and because he had not relied on Aubourg's testimony in denying the grievance. (Def. 56.1 ¶¶ 63, 64.) Neither the Union nor Plaintiff sought judicial review of the decision. (Id. ¶ 65.)

### D. New York State Division of Human Rights

On October 5, 2007, two months before the IC's denial of reconsideration, Nofal filed a complaint with the New York State Division of Human Rights ("Human Rights Division") against the Hotel, Gradnitzer, and Dertouzos for "unlawful discriminatory practices in relation to employment because of national origin, creed and opposed discrimination/retaliation." (Rose Aff. Ex. 2, at Final Investigation Report and Basis of Determination, 1.) On September 15, 2008, after its investigation, the Human Rights Division found probable cause that Defendants engaged in unlawful discrimination and recommended the case for public hearing. (Id.)

## II. Procedural History

Nofal commenced this action on March 27, 2009, raising claims under § 1981, NYHRL, and NYCAC for hostile work environment based on race, national origin,[6] and religion; and retaliatory termination for his complaints of discrimination.[7] (Compl. ¶¶ 32, 36, 40; Mem. in Opp. passim.) Defendants Hotel and Dertouzos filed an answer on May 20, 2009, and Defendant

---

[6] The record contains no evidence of discrimination based on national origin, which Nofal acknowledged at his deposition. (Nofal Dep. 140-41.)

[7] Although the Complaint pleads facts that are relevant to failure to provide religious accommodation, it does not specifically state a claim for such. (See Compl. ¶¶ 14, 15, 37, 41.) Nofal argues this theory in his Memorandum in Opposition to the Motion for Summary Judgment, and the Court will consider it. (Mem. in Opp. 18.)

Gallucci filed an answer on August 3, 2009. (Mem. in Opp. 1.) Defendants jointly filed their motion for summary judgment on October 9, 2009. (Id.)[8]

**III. Analysis**

    **A. Standard of Review**

Summary judgment is proper if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(e)(2). "[W]hen the party against whom summary judgment is sought comes forth with affidavits or other material obtained through discovery that

---

[8] The motion for summary judgment was fully briefed on November 12, 2009. On March 2, 2010, Plaintiff wrote to the Court advising that a petition signed by 126 workers at the Hotel states that one of the Defendants, Dertouzos, had falsified evidence and illegally fabricated testimony. On March 10, 2010, the Court rejected the letter as inappropriate. Three months later, Plaintiffs moved to supplement the record to include the same petition signed by 126 employees which the Court had rejected previously. The Court denies the motion to supplement: it does not comply with the Court's Individual Practices. The Federal Rules of Civil Procedure do not provide for a sur-reply and finally the petition which is offered to supplement the record is inadmissible evidence, entirely hearsay and irrelevant to boot.

generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). The nonmoving party does not need to provide "evidence in a form that would be admissible at trial in order to avoid summary judgment." Celotex, 477 U.S. at 324. Any of the types of evidentiary materials listed in Rule 56(c),[9] except the mere pleadings themselves, may oppose a summary judgment motion under Rule 56(e). Id.

### B. Section 1981

#### 1. Discrimination

42 U.S.C. § 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." While the statute does not use the word "race," the Supreme Court has held that § 1981 forbids all racial discrimination. Runyon v. McCrary, 427 U.S. 160, 168, 174-75 (1976). The Supreme Court has also held that Arabs are a race for § 1981 purposes. St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987). There is no dispute that Plaintiff is an Arab and that he contends that he was discriminated against based on his Arab race.

While Nofal's theory may be correct, he asserts absolutely no facts in support of his theory. The only comment remotely related to the Arab race was Gradnitzer's comment about his own wife, a Lebanese Christian.[10] (Nofal Dep. 137-38 ("[I]t's very dirty like to say my wife is Lebanese, in other words, my wife is Arabic, and she do this and she do that to me. . . . He used

---

[9] "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c)(2).

[10] Nofal does not distinguish between behavior which has a racial bias and behavior which is religiously motivated. The greeting used by Muslims, in the Arabic language, of "Salaam Aleikum" may be evidence of religious discrimination. At least in this case, when it was paired with the gestures of touching the forehead and eating bacon, it is not racially based. In fact, Nofal acknowledges this categorization at his deposition: "[i]f the person knows what [Salaam Aleikum] is, it's okay. But when you just hear words like I know your religion and I know something and I don't like." (Nofal Dep. 116.)

to talk to me about his wife. He showed me her picture. I don't know his wife Lebanese, he showed me her picture. He told me oh, she does this to me and that to me, you know. . . . In other words, like he married Arabic woman like I'm Arabic. . . . He said I'm married like Lebanese, she does everything to me, she make like good love to me.").) Assuming that Gradnitzer made these statements, there is nothing to support the conclusion that they were made to offend. The statements attributed to Gradnitzer contain no such connection on their face. Drawing an inference of intention to offend would require a gross generalization about the social values of members of the Arab race. See Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001) ("[A] jury cannot infer discrimination from thin air. Plaintiffs have done little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race. This is not sufficient."); Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1088 (2d Cir. 1993) (holding that mere conclusory allegations cannot support a finding of intent to discriminate based on race). Even if these salacious comments were actually made, there is nothing which connects the purported sexual behavior to the Arabic race.[11]

     Finally, Nofal argues that Defendants have created or fostered a work environment hostile to his religion. Section 1981 deals with racial discrimination not religious discrimination. See Runyon, 427 U.S. at 167. The Arab race and Muslim religion are separate categories. Hostility towards the Muslim faith does not mean there is discrimination against the Arab race. Assuming that Defendants were hostile to Islam and it is a large assumption considering the race and religion of the Hotel owners it would be wrong to assume, or infer, as Nofal does, that religious discrimination as alleged here equals racial discrimination.

---

[11] Gradnitzer's wife is Christian Lebanese, which, as Nofal concedes, means that she may identify either as Arabic or as Phoenician. (See CIA, The World Factbook: Lebanon, https://www.cia.gov/library/publications/the-world-factbook/geos/le.html (last visited Dec. 2, 2010); Mem. in Opp. 6.)

### 2. Retaliation

Nofal also alleges that the Defendants terminated him in retaliation for his complaint about their failure to accommodate his observance of Eid and for his statements in an unrelated investigation of an employee for sexually inappropriate remarks and gestures. Retaliation claims are cognizable under § 1981, see CBOCS West, Inc. v. Humphries, 553 U.S. 442, 451 (2008); but only where the retaliation arises out of a § 1981 claim. Although making a complaint constitutes protected activity, to state a claim for retaliation under § 1981, the complaint must be protected under §1981—that is, it must relate to discrimination under § 1981, not just under any statute. See CBOCS West, 553 U.S. at 452; Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 693 (2d Cir. 1998) ("[T]o be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981. An act of retaliation for engaging in activity protected by Title VII does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981."). The claimed protected activity here involves complaints about the failure to provide religious accommodation and sexual harassment, and does not fall within the protective scope of § 1981. Accordingly, the motion for summary judgment is granted as to all § 1981 claims.

### C. State Law Claims

The Court may decline to exercise supplemental jurisdiction over a claim when it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). The remaining claims arise under state and local law. There is no allegation of diverse citizenship. Accordingly, this case is dismissed in its entirety. The Second Circuit has instructed that "the court should refrain from exercising pendent jurisdiction absent exceptional circumstances." Kavit v. A. L. Stamm & Co., 491 F.2d 1176, 1180 (2d Cir. 1974).

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss on summary judgment is GRANTED as to the federal claims, and the remaining claims are DISMISSED without prejudice for lack of subject matter jurisdiction. The Clerk of Court is directed to enter judgment accordingly and terminate the case.

Dated: New York, New York
       December 3, 2010

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge